IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 19, 2016 Session

**STATE OF TENNESSEE v. RACHEL KAY BOND**

**Appeal from the Circuit Court for Lawrence County**
**No. 31533      Stella Hargrove, Judge**

_____

**No. M2015-01433-CCA-R3-CD – Filed August 31, 2016**

_____

A Lawrence County jury found the Defendant, Rachel Kay Bond, guilty of first degree premeditated murder, and she was sentenced to life imprisonment in the Department of Correction. The Defendant asserts that the evidence is insufficient and that the trial court erred when it admitted into evidence incriminating text messages allegedly sent by the Defendant. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

William M. Harris, Lawrenceburg, Tennessee, for the appellant, Rachel Kay Bond.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent Cooper, District Attorney General; Gary Howell and Christie Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from forty-six-year old Robert Oscar Davis's death on May 3, 2013, due to multiple blunt force injuries. On May 31, 2013, a Lawrence County grand jury indicted the Defendant for the first degree premeditated murder of the victim. At trial, the parties presented the following evidence: Benjamin Fisher, general manager at Schaffer's Muffler in Pulaski, Tennessee, testified that the victim was an employee at the muffler shop for approximately five and a half years. Mr. Fisher described the victim as a good and reliable employee. Mr. Fisher recalled the last time he saw the victim in May

2013.  He said that it was a Thursday evening and the victim said, "I'll see you in the morning" as he left but that the victim never arrived at work the following morning.

Tim Nolen testified that the victim had been married to his sister and that he and the victim were "best friends."  Mr. Nolen said that he and the victim were in daily contact and that the victim "texted everybody" with his cell phone.  Mr. Nolen recalled that the victim visited his home on Thursday, May 2, 2013, in Anderson, Alabama after the victim finished work.  The victim remained at Mr. Nolen's home until 2:00 or 2:30 a.m.  The victim left because he was driving a 1968 Super Sport Chevelle that night and wanted to get the Chevelle "put up" before it began raining.  Mr. Nolen said that the victim also drove a Chevrolet truck.

Mr. Nolen testified that the victim had planned to return to Mr. Nolen's residence at 5:30 a.m. to drive Mr. Nolen's truck to work.  The victim lived five or six miles, a ten-minute drive, from Mr. Nolen's residence.  Mr. Nolen never heard from the victim again after the victim left in the early morning hours of May 3.  Mr. Nolen called and texted the victim throughout the day but received no response.  At some point, Lawrence County law enforcement officers contacted Mr. Nolan to ask him questions about his last interaction with the victim.

Keith Wooten testified that he lived in West Point, Tennessee.  He said that on school mornings he would drive his nephew to the school bus stop.  On the drive to the bus stop he drove over Chisholm Creek Bridge.  On Friday morning May 3, 2013, at 6:30 a.m., as he drove his nephew to the school bus stop, he noticed a red truck parked in a parking lot area next to the bridge.  Keith Wooten thought it was odd that a vehicle would be parked there so early in the morning.  He explained that normally trucks parked there to unload four-wheelers "for the day."

Bobby Wooten, Keith Wooten's father, testified that in May 2013 he noticed a red truck parked next to the creek near his home.  He said the truck was "completely half hidden" and not the type of truck that would normally be in the parking lot.  He explained that near the creek were motorcycle and four-wheeler trails, so trucks that pulled four wheelers often  parked in that area.  The red truck he observed on the morning of May 3, 2013, had "big chrome wheels" and "road tires" unlike the trucks that Bobby Wooten normally saw in that parking area.  He recalled that the truck remained in that location for the entire weekend.  When the truck was still there on Monday morning, Bobby Wooten stopped to inspect the truck.  He said that, other than a flat front right tire, he noticed nothing unusual about the truck.  Bobby Wooten wrote down the license tag number and asked his son, Keith Wooten, to "report the truck."

2

Adam Brewer, a Lawrence County Sheriff's Department deputy, testified that his department received a report that the victim was missing on May 6, 2013. The caller indicated that no one had been in contact with the victim since May 3, 2013. After confirming this with other relatives and acquaintances, Captain Brewer issued a "be on the lookout" ("BOLO") through dispatch. The victim's vehicle information was also entered into NCIC, a national database, in the event the victim was stopped in his vehicle. At some point, dispatch was advised of an abandoned vehicle in West Point, Tennessee, that was traced back to the victim.

Captain Brewer testified that the truck was towed to the impound lot and stored as evidence. He then requested a locator be placed on the victim's cell phone. Captain Brewer said an attempt was made but there was no service to the phone, so either the phone had been turned off or the phone was in an area with no service. The Sheriff's Department also made a request to the cell phone provider for the victim's cell phone records. Captain Brewer reviewed the records and found that the last contact with the victim by phone was on Friday, May 3, 2013, at 4:58 a.m. with phone number 931-210-4741 ("4741").

Captain Brewer testified that he then began investigating the person associated with the 4741 number. After learning that the number was an "Air Voice" number sold through a second party so that AT&T would be unable to provide subscriber information, Captain Brewer requested a locator for the cell phone number. After several attempts, Captain Brewer obtained a physical address associated with the number. The address, which was the Defendant's, was located on Second Creek Road in Lawrence County.

Captain Brewer testified that, on the evening of May 8, 2013, he and Lieutenant Neese went to the Second Creek Road address to speak with the Defendant. Lieutenant Neese knocked on the front door while Captain Brewer walked around to the rear of the house "for safety reasons." Captain Brewer heard the bolt on the back door rattle and observed Rick Houser, wearing a motorcycle helmet, exit the residence. Captain Brewer stopped Mr. Houser and asked what he was doing. Mr. Houser acted suspiciously and finally answered, "I'm going to get bread." Due to his behavior, Captain Brewer asked for consent to search Mr. Houser's person for weapons. During the search, he found a small amount of marijuana and detained Mr. Houser at the front of the house.

Captain Brewer testified that the Defendant and her two children were inside the residence. While he and Lieutenant Neese spoke to her about the victim's disappearance, she appeared very nonchalant until she mentioned that the victim had called her children "bastards." When she spoke of this, she became angry and "tensed up." While at the residence, Captain Brewer looked around the backyard and saw a large shed that had been recently used and noticed piles of toilet paper as if someone were using the shed as

3

a bathroom. He explained that he thought this odd because the residence had indoor plumbing.

Captain Brewer testified that he and Lieutenant Neese collected both the Defendant's and Mr. Houser's cell phones. The Defendant confirmed that her cell phone number was 931-210-4741, the number that the phone records indicated had last made contact with the victim. Captain Brewer testified that, because the phones were "basic flip phones," little information could be gathered from the phones. He sent the victim's phone and "these" text messages to the Regional Organized Crime Information Center ("R.O.C.I.C."), an intelligence organization serving the southeast, for further analysis.

On cross-examination, Captain Brewer testified that he was familiar with the victim relevant to prior investigations of drug-related activity. Captain Brewer confirmed that he was aware of a police report on April 2, 2013, involving the victim as a trespasser on the Defendant's property. Captain Brewer confirmed that he was also familiar with Mr. Houser, a "known drug associate." Captain Brewer stated that both Mr. Houser and the Defendant were arrested at the Defendant's residence on drug charges on May 8, 2013.

Jennifer Dalmida, a Verizon Wireless Executive Relations Analyst, testified that she also served as record custodian for Verizon. Ms. Dalmida confirmed that she received a subpoena from the Lawrence County Sheriff's Department regarding the records associated with the victim's cell phone number. Ms. Dalmida said that, in response, she provided the cell phone records for the victim's cell phone number, which included sent and received text messages, the text messages' content, call details, and subscriber information. The parameter for this information was from May 2, 2013 to May 3, 2013. Ms. Dalmida explained that the records for each subscriber were kept electronically in the normal course of business operations.

Carol Gilligan, an AT&T legal compliance analyst, testified that she received a request from the Lawrence County Sheriff's Department concerning specific cell phone records. Ms. Gilligan confirmed that the requested records were kept in the normal course of business. The two numbers, 931-210-4741 ("4741") and 931-628-4802 ("4802"), requested by the sheriff's department were both accounts sold through an entity other than AT&T, and AT&T provided only the service. As such, AT&T had access to the account activity but not the subscriber names. The two accounts were not AT&T customers but were using the AT&T network. Ms. Gilligan said that the time parameter for the 4802 account was May 6, 2013, to May 8, 2013. The time parameter for the 4741 account was May 2, 2013, to May 8, 2013, and the information compiled included both voice calls and text message transmissions. The text message transmission information did not include the actual text content.

4

Kristie Wixson, a Regional Organized Crime Information Center criminal intelligence analyst, testified that she worked in the Nashville, Tennessee office. The Lawrence County Sheriff's Department requested assistance in a missing person case and, on July 1, 2014, she was assigned to assist the sheriff's department in the investigation. Lieutenant Neese provided her with telephone records for the victim, the Defendant, and Mr. Houser. Specifically, he requested cell tower mapping for the phone records.

Ms. Wixson testified that using the cell phone records and a mapping system she created a map for the cell phone usage of the Defendant's phone and Mr. Houser's phone for May 3, 2013, from 12:00 a.m. to 9:00 a.m. She created a second map based upon the Defendant's cell phone use from May 6, 2013, at 12:00 a.m., through May 8, at 12:07 a.m. She created another map for the Defendant's cell phone use beginning May 2, 2013, at 8:00 a.m. through May 5 at 11:59 p.m. She created a fourth map showing the victim's cell phone activity on May 3, 2013, from 12:00 a.m. to 5:10 a.m. The last map Ms. Wixson created showed the combined activity for the Defendant, Mr. Houser, and the victim's cell phones on May 3, 2013, from 12:00 a.m. until 5:56 a.m.

Ms. Wixson testified that Lieutenant Neese also provided her with text messages from the victim's cell phone. Ms. Wixson said that from this information she compiled the text message information into a timeline that included the actual content of the messages.

Nathan Neese, a Lawrence County Sheriff's Department deputy, testified that on May 7, 2013, Captain Brewer notified him of a missing person report filed with the sheriff's department. First, Lieutenant Neese issued a BOLO to surrounding agencies with a description of the victim and his vehicle. As a result, another deputy notified Lieutenant Neese that a truck matching the description provided in the BOLO had been located near Pinkly Bridge. Lieutenant Neese and Captain Brewer went to West Point and confirmed that it was the victim's truck. Lieutenant Neese recalled that the truck had a flat tire, the right rearview mirror had been pushed in, and there were leaves around the window and mirror. He said that the vent window on the right passenger side door of the truck was open, but the truck doors were locked. Lieutenant Neese testified that he had the truck towed to the impound lot for storage pending further investigation of the missing person report.

Lieutenant Neese testified that he spoke with the victim's family about the victim's connection to the West Point area, and he learned that the victim had "seen a female from that area." Based upon this information, Lieutenant Neese made contact with Felicia Fourakre, who had last seen the victim on May 1, 2013, at the Defendant's

5

residence in Five Points. Deputies then pursued possible leads related to cell phone records. The cell phone records indicated that the victim's last contact by phone was with the Defendant.

Lieutenant Neese testified that he also reviewed bank records in the course of his investigation. In so doing, he found that the victim's last purchase with his debit card was made on May 2, 2013, at 5:46 p.m. at a Wal-Mart in Pulaski, Tennessee. Lieutenant Neese obtained surveillance video from the Wal-Mart and confirmed that it was the victim who made the purchase at Wal-Mart on May 2. During this part of the investigation, Lieutenant Neese also learned of another cash purchase the victim made at a Walgreen's in Athens, Alabama, between 7:00 and 8:00 p.m. on May 2. Lieutenant Neese again spoke with family members to try to ascertain why the victim would have been in Athens, Alabama, and learned that some family members, specifically Timothy Nolen, lived in Anderson, Alabama. Lieutenant Neese met with Mr. Nolen who provided a statement consistent with his trial testimony.

Lieutenant Neese testified that he went to the victim's residence and confirmed that an orange Chevelle was parked in a shed, consistent with Mr. Nolen's statement about the Defendant's taking the Chevelle home before the rain began. Lieutenant Neese described the shed where the Chevelle was parked as "a pretty tight spot" and recalled that family members told him that the victim was the only one who knew how to park the Chevelle in the shed due to the small space. The keys to the Chevelle were found inside the Defendant's residence on an end table.

Lieutenant Neese testified that, on May 8, 2013, based upon information gathered from the victim's cell phone records, he and Captain Brewer went to the Defendant's residence. He described the Defendant's residence as a white, vinyl siding house with a wood front porch that sat "slightly up on a hill." He recalled that there was a wooden shed located to the back right of the residence and a second wooden "open-air" shed that sat further back behind the shed nearest to the residence. A well pump was located to the left of the back door. Lieutenant Neese introduced himself to the Defendant and explained that he was conducting follow-up on a missing person. He recalled that one of the Defendant's first questions to him was, "Have you found [the victim] yet?" The Defendant did not provide any information at the time but invited the deputies inside her home. While inside, the deputies found drugs and drug paraphernalia, and, as a result, the Defendant and Mr. Houser were arrested.

Lieutenant Neese testified that he interviewed both the Defendant and Mr. Houser at the sheriff's department following their arrests. After signing a *Miranda* waiver, the Defendant gave a statement. Lieutenant Neese read the statement aloud as follows:

[Q]uestion:    What can you tell me about [the victim] missing?

[Answer:]      I told Ricky Houser about [the victim] putting his hands on me again. I told [Mr. Houser] that I wished [the victim] would just break up with me and stay away from me. I was unable to make [the victim] stay away from me because I loved him too much.

       [Mr. Houser] said that I did not deserve that and it needed to be took care of. I did not think [Mr. Houser] meant harming him or killing him. It's just not what you think about.

       [Mr. Houser] kept calling and checking on me. [Mr. Houser] was texting me, saying he needed to get ready for [the victim] to come over. [Mr. Houser] made that statement after I told [Mr. Houser] [the victim] was coming over.

       [The victim] texted me and I was texting him back. We was talking about watching a porn movie and having sex.

       I was peeing in the bathroom and I heard [the victim] pull up . . . I heard [the victim] pull up to the house.

       While I was still in the house, I heard a loud smack, then another. And after that, I heard a loud painful moan and I knew it was [the victim]'s voice. Then I heard more loud smacks over and over again.

       I got in the shower, after locking the bathroom door.

       [Mr. Houser] was in the house and was calling my name. [Mr. Houser] came to the bathroom door and said, 'It's done, girl. You don't have to be scared no more. That mother f**ker won't hit you again.'

       I asked him, 'What did you do?'

       And he said, 'I took care of it.'

       I started to lose it and started to cry.

7

[Mr. Houser] walked away for a little while. Then [Mr. Houser] came back and started to bang on the bathroom door and told me I had to get out of the f**king bathroom. He said, 'I got to talk to you.'

I opened the door and [Mr. Houser] puts both hands on my shoulders. I asked him, 'What did you do?'

[Mr. Houser] said, 'It's okay. You don't have to be scared.'

[Mr. Houser] kissed me on the forehead and said, 'Don't worry about it.'

[Mr. Houser] wanted me to [go] outside with him. [Mr. Houser] said 'Come on, I want you to see this mother f**ker suffer.'

I closed myself back in the bathroom. I went down and started crying.

[Mr. Houser] came back to the door a few times saying, 'You have to hold it together. We are in this together.'

I kept screaming, 'I didn't want this. I loved him.'

[Mr. Houser] told me we were in the same shoes. [Mr. Houser] said, 'We have got to keep in touch.'

I stayed in the bathroom and I heard the truck start up and the truck sits there running. Then the truck took off.

[Mr. Houser] waited a little bit and then texted me asking if I was okay. [Mr. Houser] texted me saying, 'Hold it together. This is what you wanted.'

I can't remember if he said this on a phone call or sent it in a text, but [Mr. Houser] said, 'You should hear this mother f**ker gurgling.'

I asked him, 'Why did you do that? What did you do?'

[Mr. Houser] said that it would be a better life for me and my kids. [Mr. Houser] again, making sure I was okay and holding it together. [Mr. Houser] texted me and said, 'I got rid of it.'

Then he said that he dropped off the truck and got 30 miles to walk. He was texting just casual conversation. [Mr. Houser] texted me and said, 'About to get to the house.'

And he said, 'Am I going to be able to come over?'

I told him, 'It would be okay.'

I left my house and went to Nanner's (phonetic) house, which is Barry Williams.

Question: Do you know what Ricky Houser hit [the victim] with?

[Answer]: [Mr. Houser] told me he smacked [the victim] with a metal bat and he went down.

Question: Have you and [Mr. Houser] had conversation about what happened since it happened?

Answer: Yes.

Question: What was said in those conversations?

Answer: [Mr. Houser] would talk about [the victim] just dying and making a gurgling sound. [Mr. Houser] also said that he was hoping the coyotes would get him.

Question: Did [Mr. Houser] ever mention what he done with [the victim]'s body?

Answer: [Mr. Houser] said that he put his body off of a horse trail, but no one would see him, but they might smell him. He said that he wouldn't go to him, because the limbs would smack them

9

in the face. [Mr. Houser] said he laid [the victim] face down so he would not have to look at that ugly son of a b\*\*ch.

Question: We went over your statement. You stated you made a mistake. What was that mistake?

Answer: [Mr. Houser] said that I was just as guilty as he was, not that we were in the same shoes.

Question: Is there anything you want to add or take away from this statement?

Answer: Not at this time. I felt like I had to do what [Mr. Houser] said or I would get hurt.

After speaking with the Defendant, Lieutenant Neese interviewed Mr. Houser who also provided a statement. Mr. Houser confirmed that the 4802 cell phone number was his number. He denied any knowledge about the victim or the victim's whereabouts. Mr. Houser acknowledged that he sent a text message to the Defendant that said, "I got rid of it and I took care of your problem," but denied that this message related to the victim. Mr. Houser told law enforcement that he had known the Defendant for eighteen years and that one of the Defendant's daughters "should be his daughter." Mr. Houser became visibly upset when Lieutenant Neese asked if the victim had "terrorized" the Defendant and her daughters. Mr. Houser stated that the Defendant had told him that the victim had called the Defendant a "dope whore" and her children "bastards." Lieutenant Neese said that, at this point, they took a small break to allow Mr. Houser to compose himself. When Mr. Houser indicated that he was "okay," questioning resumed.

Lieutenant Neese testified that he asked Mr. Houser about abandoning the victim's truck at the creek, and Mr. Houser responded, "[N]o one saw me walking West Point." Lieutenant Neese stated that, according to the Defendant, Mr. Houser had someone pick him up and drive him home after he abandoned the victim's truck. Mr. Houser expressed that he was nervous and "going to pass out." He stated that he could not account for his whereabouts on May 3 and asked for an attorney. Lieutenant Neese terminated the interview upon Mr. Houser's request for an attorney.

Lieutenant Neese testified that the Defendant offered to take deputies to locations Mr. Houser frequented in an attempt to locate the victim's body. On May 10, 2013, the Defendant directed the deputies to a cabin in an area called "the Granddaddy Field." This cabin was located "fairly close" to Mr. Houser's residence. On this same day, the Defendant gave the deputies consent to search her residence. During the search, deputies

collected a pillow case from a closet inside the residence. Lieutenant Neese said that he also photographed a note with various telephone numbers listed on it and a "hosepipe" attached to a water spigot on the outside of the Defendant's house.

Lieutenant Neese testified that on May 11, 2013, Lieutenant Dean notified him that a body had been recovered "in the Bryant Boswell Road area." Lieutenant Neese described this area as in the western part of Lawrence County, between Lawrenceburg and West Point. When he arrived at the location where the victim's body was found, he saw "two arms sticking out from under a pile of what look[ed] to be cedar . . . trees that are laid on the ground in a pile." Lieutenant Neese noticed several cedar sapling trees in the area that had been freshly cut down at the portion of the trunk close to the ground. Once law enforcement officers began removing the cedar trees placed over the body, Lieutenant Neese saw that the body was lying face down, missing a left shoe, and clothed in camouflage boxer shorts. He recalled that a black t-shirt was found between the victim's legs at his buttocks area. Lieutenant Neese observed a tattoo on the left arm that was later used for identification purposes in confirming that the deceased was the victim.

Lieutenant Neese testified that, when recovering items from the scene, he recognized the black Kevin Harvick racing t-shirt found between the victim's legs as the same shirt the victim had been wearing in the May 2, 2013 Walgreens surveillance video taken in Athens, Alabama. Lieutenant Neese said that he also recovered cut cedar saplings from the scene. On the trail that led down to the area where the victim's body was found, law enforcement officers found a king size fitted bed sheet. Lieutenant Neese testified that, following discovery of the body, the sheriff's department obtained a search warrant for the Defendant's residence.

Lieutenant Neese testified that, during the investigation, Brandi Lewis, one of the Defendant's family members, provided Lieutenant Neese with some incriminating text messages about the victim's murder. Lieutenant Neese also recalled that Mr. Houser contacted the Sheriff's Department and that he spoke with Mr. Houser again on October 21, 2014. Mr. Houser, with his attorney present, provided a statement and then accompanied law enforcement officers to various locations to corroborate his statement. He directed the deputies to the area of "Insurance Bluff," near where the victim's truck was found, and deputies recovered the victim's truck keys at Mr. Houser's direction.

On cross-examination, Lieutenant Neese testified that to "the naked eye" the king size fitted sheet and the pillow case recovered from the Defendant's residence appeared to be the same color and were the same brand. He confirmed that no DNA was recovered from the fitted sheet.

Brandi Lewis, the Defendant's cousin, testified that on May 31, 2013, she met with Investigator Neese and provided him with text messages from May 2013 that she had exchanged with the Defendant about the victim's disappearance and death. Ms. Lewis confirmed that Lieutenant Neese had photographed some of the text messages stored on her cell phone. Ms. Lewis identified the photographs, confirming that the cell phone in the photograph belonged to her. Ms. Lewis identified a photograph of a text message the Defendant had sent her on May 1, 2013, at 6:36 p.m. The Defendant's attorney objected to the text messages being read aloud as hearsay. The trial court recognized the Defendant's continuing objection to the text messages being read aloud but overruled the objection.

Ms. Lewis read the May 1, 2013 text messages aloud. The heading on each text message stated it was received from the Defendant. The content of the messages received from the Defendant on May 1, 2013 were as follows:

6:36 p.m.: Could you get rid of any of them things? My nerves are shot. [The victim] has been cause in me trouble. I had to call the law on him.

6:54 p.m.: Hit me, smack me, just 'cause I didn't want to be with him again. He's been up for four days on that dope and is thinking crazy. Told me I was a dope whore and my kids were bastards.

6:56 p.m.: Did it. You can do and say whatever to me. When it comes to my kids you're f**king up. You know, between you and me, I am going to do what needs to be done to him a long time ago.

6:59 p.m.: They wouldn't. They just told me to call them the next time he comes over, but he'll be gone before they can get here or I'll be dead, one. I've got men taking care of it.

6:59 p.m.: My hands will stay clean. I am making sure of it. I am smarter than he thinks I am.

7:10 p.m.: Oh, trust me; I tried to put him in jail. The cops said they wouldn't, not enough reason. But if I call the law, he is still here when they get here he'll go to jail. BS to me.

12

Ms. Lewis read a final message that had "Reply with copy (931)210-4741" across the top and then "My hands will stay clean.  I am making sure of it.  I am smarter than he thinks I am."  The Defendant's attorney objected to this last text message as repetitive of the 6:59 p.m. message.  The trial court overruled the objection.

Ms. Lewis testified that she asked the Defendant "if [the victim] was dead" in a text message she sent on May 8, 2013.  Ms. Lewis did not receive a response to this question from the Defendant.

On cross-examination, Ms. Lewis testified that she was not concerned that "anything" was going to happen based upon the May 1 text message exchange with the Defendant.  She said that she had deleted the messages she sent to the Defendant during the May 1 text exchange.  Ms. Lewis could not remember when she deleted her responses but said that it was before she went to the sheriff's department.  Ms. Lewis agreed that she was concerned that "all of this" might somehow be traced back to her but stated that she had nothing to do with the victim's death and that she believed that the Defendant did not as well.

On redirect examination, Ms. Lewis confirmed she had contacted the sheriff's department about the text messages after learning that the victim was dead, and the Defendant had been arrested.

Casey Koza testified as an expert witness in the field of forensic serology.  Ms. Koza stated that in 2013, she was employed as a forensic serologist for the Tennessee Bureau of Investigation ("TBI").  Ms. Koza recalled that she was assigned to test the victim's truck for DNA evidence.  She described the truck as very muddy with mud marks on the inside of the truck as well.  On the outside of the truck, Ms. Koza identified reddish-brown stains on the plastic bumper molding, along the metal trim of the truck where the bumper would sit, and on the side of the tailgate.  On the inside of the truck, she identified staining on the door panel on the driver's side and the floorboard.  She collected samples of the stains and then tested the samples to confirm whether the stains were human blood.

Ms. Koza testified that the test of the sample collected from the driver's side door panel inside the truck indicated the presence of blood, but, due the limited sample, she was unable to conduct additional testing to confirm that the sample was human blood.  Ms. Koza took samples from the steering wheel, the gear shifter, and the driver's side floorboard, which all indicated the presence of blood.  Ms. Koza tested the truck bed liner, and the test indicated the presence of blood on the interior of the bed liner; however, she could not do any further testing on the liner because she was unable to

13

localize the stain on the dark liner. The samples taken from the tailgate indicated the presence of human blood.

Ms. Koza testified that she also tested samples taken from various items in the truck. The test results for a ball cap and a white napkin indicated the presence of blood, but due to the limited sample, she was unable to confirm that the blood was human blood. Likewise, a brown paper bag found in the bed of the truck indicated the presence of blood, but due to the limited sample Ms. Koza was unable to confirm that the sample was human blood.

Ms. Koza testified that she also received a black t-shirt from the Lawrence County Sheriff's Department. Ms. Koza conducted a presumptive test on the shirt and found the presence of blood. Due to the shirt being black, she was unable to localize a specific stain for further testing, so she took two "cuttings" from the front of the shirt and the back of the shirt to submit for further DNA testing.

David Hoover, a TBI latent fingerprint examiner, testified as an expert witness in the field of latent fingerprint analysis. Mr. Hoover testified that he processed the victim's 2001 red Chevrolet truck for latent fingerprints. Mr. Hoover found fingerprints that were "of value" for identification purposes, mostly on the windows of the truck. Mr. Hoover "matched" two of the prints to individuals: Timothy Wayne Gillespie and Heather Marie Nowlin. He stated that he also tested "numerous items" from inside the truck, one of which was a Sun Drop can found in a cup holder located in the front console of the truck. The fingerprint obtained from the can matched the Defendant's fingerprint. Fingerprints were also obtained from a "Marlboro piece of paper" found on the dashboard of the truck. These prints were identified as the victim's prints.

Miranda Gaddes, a TBI forensic scientist in the Trace Evidence Unit, testified as an expert witness in the field of microanalysis and trace evidence. Ms. Gaddes testified that she compared a green sheet found at the location where the victim's body was found and a green pillowcase retrieved from the Defendant's residence. She said the linens were similar in color and the same brand, but microscopically the construction of the fabrics were different.

Mike Turbeville, a TBI Forensic Biology Unit supervisor, testified as an expert witness in the field of serology and DNA analysis. Dr. Turbeville swabbed various areas of the 2001 red Chevrolet truck to obtain numerous DNA profiles, most of which matched the victim's DNA profile. A DNA profile located on the radio face inside the truck, however, matched the Defendant. Dr. Turbeville noted that some of the profiles collected were mixtures containing DNA from three or more individuals. He explained

14

that when this occurs, "it gets very complicated" and often results in inconclusive results as occurred with some of the samples collected from the truck.

Adele Lewis testified as an expert witness in the field of forensic pathology. Dr. Lewis testified that she performed the autopsy of the forty-six-year-old victim on May 13, 2013. Dr. Lewis stated that the body was in a state of moderate to advanced decomposition with most of the skin on the face no longer present. Due to the decomposition, Dr. Lewis sought the help of a forensic anthropologist, Hugh Berryman. Based upon the examination of the body, Dr. Lewis concluded the cause of death was blunt force injuries to the head and the manner of death was homicide.

Hugh Berryman testified as an expert witness in the field of forensic anthropology. He testified that he examined the remains on May 20, 2013, at the request of the Medical Examiner's office. The bones from the cranium were in pieces and "highly fragmented." As he examined the skull bones he determined that some of the parts of the skull were missing. The "major areas missing" were the right upper part of the skull, the right lower part of the face, a portion of the left side cranial vault, and an area missing from the right parietal bone. In referencing photographs, Dr. Berryman noted a fracture to the jaw bone that was likely caused by blunt trauma. Based upon his reconstruction of the remains, Dr. Berryman opined as to the four impact sites on the victim's skull. The various fractures in the victim's bone structure were consistent with repeated blunt force trauma. He estimated that, although he identified four impact sites, the victim sustained "many more" blows to his head than four.

Ricky Houser testified that he was charged with the first degree premeditated murder of the victim and had entered an agreement with the State with regard to his charge. Mr. Houser was to plead guilty to second degree murder with a thirty-five year sentence in exchange for his truthful testimony at the Defendant's trial.

Mr. Houser testified that, in May 2013, he lived on Mount Lebanon Road in Lawrence County. Mr. Houser identified the Defendant in court and stated that he had known her for twelve to fourteen years. He said the two were "close friends" and romantically involved "[o]ff and on" during that time. Mr. Houser confirmed that he became aware in the spring of 2013 that the Defendant was in a relationship with the victim. He did not know the victim, but the Defendant spoke with him about the victim at the end of April 2013. He recalled that the conversations occurred over the phone and that most were text messages because the Defendant lived in Five Points on "the other side of the [c]ounty." During these communications, the Defendant told Mr. Houser that the victim was beating her "again." He said that she first told him of physical violence in February or March.

Mr. Houser testified that one night four or five days before the victim's murder, he went to the Defendant's residence. Mr. Houser said that he waited outside the house in "a little old chicken coop" until the following morning when the Defendant's children left for school. After the children left, he texted the Defendant and asked if it was okay for him to come inside her residence before entering. The Defendant told Mr. Houser that the victim beat and raped her and Mr. Houser saw bruising on the Defendant's face. Mr. Houser recalled that, during this conversation, the Defendant asked Mr. Houser to "get rid of [the victim]." Mr. Houser said that the Defendant had already communicated this request by text before Mr. Houser arrived at the residence the night before.

Mr. Houser testified that he advised the Defendant to call the police about the abuse but that the Defendant refused this advice, explaining that she had called the police on two or three occasions and it did "no good." Mr. Houser said that the Defendant told him that she had a restraining order against the victim but that he would come to her residence anyway. According to Mr. Houser, the Defendant said that she had arranged for someone else to "get rid of" the victim, but they had "backed out on her." So, the Defendant told Mr. Houser that she wanted Mr. Houser to "get rid of" the victim. When asked about his response to her request, he said, "She say, 'Jump.' I say, 'How high?'" Upon further questioning, he said that this had always been the nature of his relationship with the Defendant. He stated that he had always loved the Defendant.

Mr. Houser testified that he agreed to "get rid of" the victim, but the two did not discuss any details. He said that he had packed clothing, a baseball bat, and a machete to take to the Defendant's residence. Mr. Houser stayed at the Defendant's property for the remainder of that week waiting for the victim to show up. The Defendant had told Mr. Houser that the victim had come to her residence four or five times in the last couple of months, so they believed he would be back. The Defendant said that the victim could show up "any random night" and often did so "real late." Mr. Houser said that he stayed outside when the Defendant's children came home from school. He described the grass as chest high in the backyard, so it was "[p]retty easy to hide." Mr. Houser estimated that, while waiting for the victim to appear, he spent two or three nights outside, and he stayed inside one or two nights when the children were staying with a family member.

Mr. Houser testified that the baseball bat was silver and reflected the moon light at night. Due to his concern about detection, the Defendant gave him black electrical tape, and he wrapped it around the bat one day while he was inside her residence.

Mr. Houser testified that one of the nights the Defendant's children were away and both he and the Defendant were inside the residence, the Defendant received a text message at 3:00 or 4:00 a.m., and she said, "It's him." Upon learning this, Mr. Houser went outside because he "didn't want to sit [t]here and listen to her talking about getting

16

with him." As he exited, he told the Defendant, "Get him in here." Mr. Houser said that he went outside with his bat and waited behind the shed that was closest to the residence for the victim to arrive.

Mr. Houser testified that he saw a red pickup truck pull in behind the Defendant's house and behind the shed where he was waiting. Mr. Houser said that he approached the driver's side of the truck from the rear and "hollered" at the victim as he was exiting the truck. Mr. Houser noticed that the victim was dressed in his underwear and was holding a DVD player in his hand. The victim lunged at Mr. Houser, and Mr. Houser hit the victim in the forehead with the bat. Mr. Houser said that after he struck the victim, the victim fell to the ground. After the victim was lying flat on the ground, Mr. Houser hit the victim two more times on the side of the head. Mr. Houser estimated that he hit the victim between three and five times with the intention of killing the victim.

Mr. Houser testified that, after striking the victim, he tried to load him into the truck. He could not lift the victim so took a board from the shed and tried to slide the victim onto the board and then into the truck. He described the "board" as "an old door or something." He placed the "board" on the tailgate of the truck and used it as a ramp but still was unable to move the victim into the truck bed. When his attempts were unsuccessful, he went inside the residence to get the Defendant to help him. The Defendant was in the bathroom at the far end of the residence. Mr. Houser told the Defendant to come out to help load the body, and the Defendant joined him. On the way outside, the Defendant retrieved gloves from under the kitchen sink for both her and Mr. Houser to wear while moving the body.

Mr. Houser testified that he and the Defendant went outside, laid the "board" flat on the ground and then rolled the victim over onto the "board." They then lifted the board up and placed it in the bed of the truck. Mr. Houser told the Defendant to "clean up" and left her with his clothes to wash. He said that he also sprayed an area behind the shed with a water hose to wash away any blood that might have been on the ground. The Defendant retrieved a "bluish" blanket from her closet, and the two covered the victim's body with it.

Mr. Houser testified that he did not know the area well, so he drove the victim's truck to an area in West Point that he knew. He recalled that the victim was still breathing when he left the Defendant's house. The gas tank in the truck was low, so Mr. Houser stopped, approximately fifteen minutes from the Defendant's house, at a gas station on Rabbit Trail Road. He purchased $6 of gas, all the money he had at the time, before proceeding to West Point. He noted that the blanket had blown off the victim, and the victim was no longer breathing during the gas station stop. Mr. Houser described the

route he took after the gas station stop and stated that he communicated with the Defendant via cell phone during the thirty to forty minute drive.

Mr. Houser testified that he "dumped" the body near a four-wheeler trail approximately 1,000 yards from the main road. He said the area was a thirty to forty-five minute walk from his home. Mr. Houser recalled that he dragged the victim's body into the woods and covered it with leaves and a few cedar trees that he cut down with the machete. He clarified that he may have covered the body with the trees the following day and not during the initial trip. Mr. Houser stated that, after leaving the body in the woods, the baseball bat, "board," and blanket remained in the bed of the truck. He said that he put the blanket in a "big mud hole" that was along the trail leading out to the area where he had left the body and ran over the blanket repeatedly to "mash" it down, thinking it would never be found. He also attempted to wash out the bed of the truck with muddy water from the mud hole.

Mr. Houser testified that he then returned to the main road with the blanket and the baseball bat and drove to an area in West Point where there were four-wheeler trails. He could not recall the name of the area, but he described a concrete bridge with a gravel area where "everybody" parks. He said there was also a "big old creek," approximately seventy-five feet wide, that one could drive across. It was into this creek that Mr. Houser threw the bat and the DVD player. He also washed out the bed of the truck with the creek water using a white five-gallon paint bucket that he found in the bed of the truck. Mr. Houser then locked up the truck, took the keys with him, and walked to his home.

Mr. Houser testified that it took him around five hours to walk home. On the walk, he hid the keys by a cedar tree along the road and threw the victim's emptied billfold over "Insurance Bluff." He said that he was still communicating with the Defendant via text messages as he walked home. He returned to the area where he had left the body after midnight that night. He explained that he went back to the site on two occasions and could not recall what he did on each occasion. The first time he planned to dig a hole and bury the body but when he was unable to do so, he cut down small trees and placed them over the body.

Mr. Houser testified that the victim came to the Defendant's residence in the early morning hours of Friday, May 3, 2013. After disposing of the victim's body, he spent Friday night away from the Defendant's residence and then returned on Saturday, May 4. Mr. Houser explained that he borrowed his neighbor's motorcycle to drive to the Defendant's residence. He remained there until the following Wednesday, May 8, 2013, when Lieutenant Neese and Captain Brewer came to the Defendant's residence. Mr. Houser stated that, after disposing of the victim's body, he had returned to the

18

Defendant's residence, where he and the Defendant spoke about what had occurred, and he told her where he had taken the victim's body.

Mr. Houser acknowledged that the toilet paper and "evidence of someone using the bathroom" in the shed behind the Defendant's residence were from when he stayed in the chicken coop waiting for the victim. He said that he stayed up all night the three or four nights he waited in the chicken coop for the Defendant and that he sent and received text messages during that time. He said that, during the day, he would sleep inside the Defendant's residence. He said that he exchanged text messages with the Defendant while in the chicken coop and also a friend of his named Derek Peters.

Mr. Houser testified that he had never assaulted anyone in a violent manner before the night at issue. When asked why he did this, he said, "Because she wanted me to. [The Defendant], you know, asked me to do it." In retrospect he said he felt "not too good" about what he had done. Mr. Houser denied that, following this incident, the Defendant ever told him that she did not want him to kill or hurt the victim. He said that she did not ever express remorse in words but that he believed she was "upset about it" in the same way that this had affected him.

Mr. Houser described his mental state at the time he learned the victim was coming to the Defendant's house as follows:

> I mean, we had been sitting there for four or five days. I - - I was ready for it to end. . . . I was trying to go home or get it over with; whatever happened, happened. Just, I'm through being - - I'm tired of being here and just got to do something, you know. Good or bad, had to get it over with. I was so stressed out by then, I just wanted - - it over with."

On cross-examination, Mr. Houser testified that when he was unable to load the victim's body into the truck by himself and he went inside to enlist the Defendant's help, the Defendant was hysterical and "shook up." He agreed that he told her if she did not come and help him load the body, he would just leave. The Defendant told him that she did not know if she could do it, and he insisted that she had to help him. He further agreed that the Defendant acted fearful of him the following day. He clarified that he was unsure of the exact sequence of events and that he may have gone directly into the house after he hit the victim, returned outside to try to load the victim into the truck, and then gone in the house a second time to enlist the Defendant's help. He agreed the Defendant was "freaking out." He denied, however, that she said to him, "What did you do? Why did you do it?" He agreed that he told the Defendant that she needed to "come out here and watch him suffer," after he hit the victim with the baseball bat.

19

Mr. Houser testified that he left the Defendant's house and drove approximately 100 yards away but then returned for gas money. He was unsure whether the Defendant was standing outside when he left for the second time. Mr. Houser agreed that he and the Defendant were doing drugs during the time he was at her residence waiting for the victim. He agreed that he felt the need to protect the Defendant and believed the victim was "not a nice man." He further agreed that there was no specific plan in place for killing the victim.

On redirect examination, Mr. Houser testified that, during their subsequent communications, the Defendant told him that she sprayed the grass with water until the well ran dry.

The Defendant testified that she was thirty-four years old, and she had dropped out of school in the tenth grade. The Defendant stated that she had met the victim five years before when they were introduced through Connie Davis. She said they began texting and then casually dating. She described most of the time they spent together as involving sex and smoking methamphetamine. She described the relationship as "drama" with a lot of fighting and then making up. She said that the victim choked and hit her but explained that she would get back together with him because she loved him. She further noted that he had "dope," and she "liked the sex," as her incentives to reconcile with the victim following their fights.

The Defendant testified that, at the time of these events, she was addicted to methamphetamine and prescription medication. The Defendant recalled an incident at the end of March or beginning of April in 2013, when the victim "almost" kicked her door in. As a result, she filed a police report, and a police officer told her that the victim would have to be present at her residence before law enforcement could get involved. She said that she and the victim reconciled on April 22 after the victim came to her house and spent the night. The following day, the victim left his methamphetamine at the Defendant's residence, and the Defendant smoked all of it. The Defendant recalled that the victim was angry she had smoked his methamphetamine and hit her. After the victim left, the Defendant called Mr. Houser and told him that the victim had hit her and asked him to "whoop [the victim's] butt." She said this phone conversation happened on a Monday night, and she invited Mr. Houser to her house, but he did not come until Thursday morning at around 6:00 a.m.

The Defendant testified that the two smoked methamphetamine all day, and she "caught Mr. Houser up" on what was going on in her life. The Defendant said that Mr. Houser had brought the drugs to her house at her request. The Defendant denied asking Mr. Houser to kill the victim. She said that Mr. Houser agreed to "kick [the victim's] butt" because he was upset about the Defendant's bruises.

20

The Defendant agreed that she sent text messages to her cousin Brandy Lewis during this time period. She identified the printed text messages in court and confirmed that she had sent the messages. She stated that she sent a text message at 6:30 p.m. on May 1 to find out if Ms. Lewis had any Xanax. The Defendant confirmed that she sent the text message stating, "I'm going to do what needs to be done to him a long time ago." She explained that she was angry that he had called her children bastards and wanted "his butt kicked." In reference to the message she sent stating, "I've got men taking care of it," she said that she meant she had Larry Green stay with her for a few nights for safety and that Mr. Houser was going to "kick [the victim's] butt." She explained the text message stating, "My hands will stay clean. I'm making sure of it," was to keep the victim from finding out she had arranged an assault. She was concerned about retaliation should the victim learn she had instigated the assault.

The Defendant testified that she and Mr. Houser stayed awake all Thursday night smoking methamphetamine. Early Friday morning, she received a text message from the victim. She said that Mr. Houser was aware of the text message and went outside. The victim was texting the Defendant asking to have sex and watch pornography. He also referenced "pow wow," which she indicated was methamphetamine. While texting with the victim, the Defendant was also texting with Mr. Houser to let him know the victim was coming over. The Defendant was in the bathroom when she heard the victim's truck pull up. She then heard a "big smack" and the victim moan. She heard "more smacks" and "freaked out." She said she began crying and stayed in the bathroom because she did not know what to do.

The Defendant testified that she knew Mr. Houser was going to beat up the victim but that the noise "sounded awful." Five minutes after she heard the noises, Mr. Houser came into the residence and told her he had taken "care of it." The Defendant responded, "what did [you] do[?]" and "what ha[ve] you done?" Mr. Houser told her that he had done what she wanted and "it would be better off for [the Defendant] and the kids." The Defendant said that, at this point, she was very upset because Mr. Houser had "just killed [the victim]" and she "loved [the victim]."

The Defendant testified that Mr. Houser left and then returned a second time. He told her to "get it together" and asked her to open the bathroom door. When she did, he shook her and again told her to "get it together." She stated that she did not leave the bathroom until after Mr. Houser had driven away. The Defendant agreed that she still communicated with Mr. Houser after he left her residence. She denied leaving the house, helping Mr. Houser with the body, hosing down the yard, or giving Mr. Houser gas money. She agreed that she washed clothing Mr. Houser gave her because she was already doing a load of laundry and normally washed his clothing.

21

The Defendant testified that Mr. Houser updated her on his route and what he was doing after he left her residence. He also checked to see if the Defendant was "okay." He let her know when he had disposed of the body and the truck. On Friday night, Derek Peters brought Mr. Houser to the Defendant's residence and Mr. Houser retrieved his clothing before leaving again. While he was at her house, Mr. Houser was "bragging" about "it." She said that Mr. Houser told her that she should have seen the victim "gurgling."

The Defendant testified that Mr. Houser returned again on Saturday night. She said that she let him inside her home because she was afraid of him because he had "just killed my boyfriend." She said that she did not know his "mind frame," so she was not going to tell him no. While at her residence this time, Mr. Houser told her that she was just as complicit in the victim's murder as he. She said that she did not call the police because she was scared and thought it would not do any good. She said that Mr. Houser stayed with her for the rest of the following week. She said that he never left her alone during this time.

The Defendant testified that Mr. Houser obtained a motorcycle on the day of their arrest at her residence. She said David Johnson drove her and Mr. Houser to get the motorcycle in West Point. When they returned to her residence, her children were at her house after returning home from school on the school bus.

On cross-examination, the Defendant denied ever having seen Mr. Houser with a baseball bat while he was at her residence. The Defendant stated that her bathroom was located at the far side of the residence from where the altercation took place and that there was no window in the bathroom. She could not explain how she could distinguish "smacking" sounds heard from inside the bathroom as "very serious" as opposed to the "smacking" sounds one might hear in the course of a normal fight as she had asked Mr. Houser to do. The Defendant stated that she did not want the victim to get hurt, she merely wanted his "butt kicked." She agreed that she did not call 911 or notify authorities of what had occurred even after Mr. Houser left. She did, however, send a text message to Randy Flatt at around 6:00 or 6:30 a.m. asking if he would exchange Lortab for sex. She explained that she was "needing something" because she was crying and upset.

Based upon this evidence the jury convicted the Defendant of first degree premeditated murder. It is from this judgment that the Defendant now appeals.

## II. Analysis

22

The Defendant asserts that the evidence is insufficient to support her conviction for first degree premeditated murder and that the trial court erred when it admitted the text messages allegedly sent by the Defendant to Ms. Lewis without a proper foundation and in violation of the rule of completeness.

## A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support her conviction for first degree premeditated murder. The State responds that there was proof beyond a reasonable doubt that the Defendant acted with the intent to promote and assist the premeditated murder of the victim. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of

the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute on other grounds as stated* in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree premeditated murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2014). Premeditation is defined as "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Brown*, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Rosa*, 996 S.W.2d 833, 837 (Tenn. 1999) (citing *Brown*, 836 S.W.2d at 539)). The use of a deadly

weapon upon an unarmed victim may support the existence of premeditation. *See State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

At trial, the State proceeded under a theory of criminal responsibility to prove the Defendant's guilt of the offenses. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." The person must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant's requisite criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." *Id*. at 171. Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. *Id*.

The evidence, viewed in the light most favorable to the State, shows that the Defendant, who was angry with the victim, contacted Mr. Houser and asked him to "get rid of" the victim. Mr. Houser stayed at the Defendant's residence for several days waiting for the victim to arrive. Mr. Houser brought with him a baseball bat and a machete to assist in "get[ting] rid of" the victim. Mr. Houser remained outside at night watching for the victim to arrive and police officer observations of the shed behind the Defendant's residence corroborated this statement. After text communication with the Defendant, the victim arrived at the Defendant's residence in the early morning hours. As the victim exited his truck, Mr. Houser hit the victim, who was holding only a DVD player, multiple times in the head. The Defendant provided Mr. Houser with gloves to conceal his involvement and then she helped load and conceal the then still alive victim into the truck for disposal. The Defendant remained in contact with Mr. Houser, tracking his progress, all throughout the morning as Mr. Houser disposed of the victim's body in a wooded area and abandoned the truck near a creek. Mr. Houser then returned to the Defendant's house, where he stayed with her until both were arrested for drug charges on

May 8, 2013.  This is sufficient evidence upon which a rational jury could find the Defendant criminally responsible for the death of the victim.

The Defendant argues that Mr. Houser's testimony was inconsistent at trial.  We reiterate that the trier of fact resolves questions concerning the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence; an appellate court should not re-weigh or re-evaluate the evidence.  *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659.  Furthermore, a verdict of guilt by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case.  *Bland*, 958 S.W.2d at 659.  In this case, by its verdict, the jury resolved any inconsistencies in favor of the State's theory that the Defendant committed the offense for which she was convicted.

The Defendant also argues that the State failed to prove that the Defendant acted with premeditation.  The State correctly notes, however, that the Defendant was not being accused of beating the victim to death but rather that she was criminally responsible for the victim's death based upon the conduct of Mr. Houser.  As discussed above, the State was required to prove that the Defendant acted with the intent to promote or assist in the commission of the murder.  The evidence, in the light most favorable to the State, showed that she solicited Mr. Houser's assistance in "get[ting] rid of" the victim, helped him plan the murder, allowed Mr. Houser to stay at her residence to wait for the victim, encouraged the victim to come to her residence through text messages, provided items such as gloves and a blanket for concealment, notified him when the victim was coming, and had ongoing contact with Mr. Houser following brutal killing of the victim.  This evidence supports the jury's conclusion that the Defendant furnished substantial assistance in the commission of this offense.  The Defendant is not entitled to relief.

### B. Admission of Text Messages

The Defendant argues that the trial court erred when it allowed the photographs of the Defendant's text messages to be entered into evidence without a foundation.  She further asserts that introduction of the text messages without the messages Ms. Lewis sent in response violated the "rule of completeness."  The State responds that the trial court did not abuse its discretion by admitting the text messages.  We agree with the State.

We first note that, although the Defendant frames her issue as challenging authentication, she appears to concede this issue in her brief stating "even though the evidence presented may have been authenticated by [Ms. Lewis], the evidence certainly does not satisfy [Rule 106]."

26

Rule 106 of the Tennessee Rules of Evidence provides as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness be considered contemporaneously with it." This rule "allows the trier of fact to 'assess related information at the same time rather than piecemeal.'" *State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000) (quoting NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 106.1, at 33 (3d ed. 1995)). Evidence offered pursuant to Rule 106 "must be relevant to issues in the case . . . and . . . must explain or qualify already-admitted evidence." *State v. William Pierre Torres*, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *33 (Tenn. Crim. App., at Knoxville, Mar. 13, 2001) (citing *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996); *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988)). To determine whether the evidence explains or qualifies already admitted evidence, courts should consider whether the evidence "(1) explains the admitted proof; (2) places the admitted proof in context; (3) avoids misleading the trier of fact; or (4) ensures a fair and impartial understanding of the proof." *Id.* (citing *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999); *Glover*, 101 F.3d at 1190; *United States v. Sources*, 736 F.2d 87, 91 (3d Cir. 1984)). This Court has emphasized that Rule 106 is a rule of timing rather than of admissibility. *Denton v. State*, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996). "The rule assumes that the remaining portion of [a] statement [admitted pursuant to Rule 106] would be ultimately admissible." *Id.* Finally, we note that a trial court's determination concerning the admission of evidence pursuant to Rule 106 will be reversed on appeal only when there has been an abuse of discretion. *Id.*

The trial court did not abuse its discretion when it allowed the State to present the content of the Defendant's text messages to the jury. Consideration of Ms. Lewis's text messages was unnecessary to place the admitted proof into context or to explain the admitted proof. When asserting that the jury should have heard the entire text exchange, the Defendant claims that the absence of Ms. Lewis's responses deprived the jury of "any context." In our view, the jury did not need to see the entire text exchange in order to ensure a fair and impartial understanding of the proof. Ms. Lewis had deleted her responses before speaking with the Sheriff's Department and the messages were not recoverable from the Defendant's phone. The Defendant, however, in her testimony at trial provided context to the text messages and the content of Ms. Lewis's responses to her text messages. Therefore, the record does not reflect that the jury was misled by hearing only the Defendant's text messages read aloud. The Defendant is not entitled to relief on this issue.

### III. Conclusion

27

Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE